UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK
------------------------------------------------------------------X
CHANICQUA N. WILLIAMS,

                Plaintiff,

    - against -

NANCY A. BERRYHILL, ACTING COMMISSIONER
OF SOCIAL SECURITY,

                Defendant.
------------------------------------------------------------------X
ROSLYNN R. MAUSKOPF, United States District Judge.

**MEMORANDUM AND ORDER**
16-CV-5606 (RRM)

       Plaintiff Chanicqua N. Williams brings this action against Nancy A. Berryhill,[1] Acting

Commissioner of the Social Security Administration ("Commissioner"), pursuant to 42 U.S.C.

§§ 405(g) and 1383(c)(3) to review the Commissioner's decision to deny Williams' applications

for Social Security Disability Insurance Benefits ("DIB") and Supplemental Security Income

("SSI") due to lack of disability. (Compl. (Doc. No. 1).) Both parties have moved for judgment

on the pleadings. (Pl.'s Mot. (Doc. No. 13); Def.'s Mot. (Doc. No. 15).) For the reasons

explained below, Williams' motion is granted in part and denied in part, the Commissioner's

motion is granted in part and denied in part, and the case is remanded for further proceedings

consistent with this opinion. To the extent Williams moves for remand based on an

insufficiently substantiated determination of her sitting limitations and the corresponding error in

assessing other work she could perform, her motion is granted. It is denied in all other respects.

## BACKGROUND

### I.    Procedural History

       Williams filed an application for DIB and SSI on December 20, 2012, alleging an onset

---

[1] This action was originally brought against Carolyn W. Colvin in her capacity as then-Acting Commissioner. The
current Acting Commissioner, Nancy A. Berryhill, has been automatically substituted. *See* Fed. R. Civ. P. 25(d).

of disability on January 24, 2012.  (Admin. R. (Doc. No. 18) at 221, 228.)  These applications were denied, and Williams requested a hearing before an administrative law judge, which was held on December 4, 2014, before Judge Jay L. Cohen ("the ALJ").  (*Id.* at 36, 111–17.)[2] Testimony was taken from Williams, represented by attorney Douglas Brigandi; medical expert ("ME") Chaim Eliav, M.D.; and vocational expert ("VE") Andrew Pasternak.  (*Id.* at 36–88.) On February 23, 2015, the ALJ issued a decision that Williams was not disabled for purposes of either DIB or SSI.  (*Id.* at 21–31.)  On August 22, 2016, the Social Security Appeals Council denied review.  (*Id.* at 1–4.)  Williams subsequently appealed to this Court.  (Compl.)

## II.    Administrative Record

### a.    Testimony and Evidence from Williams

Williams was born in December 1976.  (Admin. R. at 221.)  From November 1997 to January 24, 2012, she worked for the Department of Education as a paraprofessional, going to and from class with students, including taking stairs, and otherwise monitoring, shadowing, and assisting the children.  (*Id.* at 250, 275–76, 285.)  She walked and climbed stairs 6.4 hours a day, and stood and sat 3.2 hours a day.  (*Id.* at 250, 276.)  The heaviest weight she lifted was lighter than 10 pounds.  (*Id.*)  From May 2006 to December 2011, Williams also worked as a youth tennis instructor and administrative assistant at Youth and Tennis, Inc., in Queens.  (*Id.* at 285.)

On an undated disability report, Williams stated she had stopped working on January 24, 2012, due to "reflect sympathetic dystrophy of lower limbs left foot," "nerve damage in left heel," and "calcaneus fracture of left heel bone."  (*Id.* at 248.)  For treatment of the injury to her left foot, she had seen Drs. Noor Khan, Harry Lopez, Osafradu Opam, and Rajpaul Singh.  (*Id.* at 251–54.)  She had received a cast, an MRI/CT scan, an X-ray, an EMG/NCV test, and

---

[2] Williams previously appeared for a hearing before ALJ John J. Barry on May 30, 2014, but the hearing was deferred for the submission of additional medical records, and no testimony was taken.  (Admin. R. at 89–94.)

prescriptions for pain medications.  (*Id.* at 250–54.)

In a disability report dated December 22, 2012, interviewer S. Burrell noted that Williams "had trouble walking and standing.  She limped and used a cane for assistance."  (*Id.* at 245.)

In a function report dated January 21, 2013, Williams stated that she lived alone.  (*Id.* at 264.)  She had no problems with personal care, cooked weekly, and did some cleaning, but she had to sit for some cooking tasks and could not vacuum due to pain.  (*Id.* at 265–67.)  She went out once or twice a week by car and went shopping for groceries once a month, sometimes by computer.  (*Id.* at 267–68.)

Prior to her injury, Williams was outgoing and busy, loved to help others, worked six days a week, and could play sports, dance, and wear high heels and shoes with backs.  (*Id.* at 265, 268.)  At the time of the report, however, she could not perform her work duties or participate in many social activities, and she had to accept help from others.  (*Id.* at 268–69.)  She walked on her left toes and right foot, "at times tippy-toed" on both feet, and she could not bear her total weight on her left heel.  (*Id.* at 269.)  She used a cane to walk, as prescribed by a doctor, and could walk half a block before needing to rest for about 20 minutes.  (*Id.* at 271.)  When sitting, she leaned slightly to the right with her left leg extended and could not sit for long periods.  (*Id.* at 270.)  She also had trouble with taking the stairs and squatting.  (*Id.*)

Williams said she first felt her pain on December 8, 2011, when she fell down the stairs at work.  (*Id.* at 273.)  Since then, she experienced "squeezing, burning" pain in the bottom of her left foot daily for varying durations, which was brought on by walking, stretching out her legs, or twisting her legs.  (*Id.* at 272–73.)  Stress caused her foot to throb and ache, and her pain woke her up at night.  (*Id.* at 265, 273.)  The pain was still strong at the time of the report, but by then, she could touch her skin and not feel the pain.  (*Id.* at 272.)

Williams was receiving medical treatment from Dr. Singh, and she had tests to evaluate her pain from Dr. Opam. (*Id.* at 273.) She had been taking Naproxen, Gabapentin, and Tramadol since December 2012, which usually relieved her pain in 30 to 45 minutes for a duration of a few hours, but she experienced unspecified side effects. (*Id.* at 272, 274.) To relieve pain, she meditated and used a cane and an alcohol and Epsom salt soak. (*Id.* at 274.) She did not walk much, but would typically read and watch TV, and her weekly activities included grocery shopping and visiting her mother. (*Id.*) In describing how her activities had been affected, she wrote, "It takes a lot of effort to walk (from a parking space, around the store)[;] the pain em[a]nating from my heel travels up my calf into my back/spine. Sitting with bent legs for an extended period of time." (*Id.*)

In another undated disability report, Williams provided updates to a prior report dated December 20, 2012. (*Id.* at 258.) She reported new limitations of pain in the right foot and hip, and a twitch in her left eye, starting around March 2, 2013. (*Id.*) She had seen Dr. Lopez, who treated Williams' left foot via injection and medication for pain, and referred her to physical therapy. (*Id.* at 259.) She had also continued to see Dr. Singh and received medication and ointment to decrease pain. (*Id.*) She reported taking Gabapentin, Naproxen, Tramadol, and Voltaren for pain, which caused side effects of stomachache, dry eyes, and dry mouth. (*Id.* at 260.) Williams had not worked since her last disability report. (*Id.* at 261.) She was able to cook and wash independently but needed assistance for shopping. (*Id.*)

Williams testified before the ALJ on December 4, 2014. She was driven to the hearing by her mother. (*Id.* at 52.) Williams lived alone and had not worked as of January 21 or 24, 2012, at which time she had been a paraprofessional for 16 years. (*Id.* at 40–42.) She testified that her work day consisted of "75 percent walking through . . . a five-story building assisting

students." (*Id.* at 42.) Specifically, she helped physically and mentally handicapped students aged 11 to 14 in their daily activities, including taking them around the school, getting them on and off buses, and lifting them onto the toilet. (*Id.* at 42–43, 52.) She sometimes assisted students in the classroom and carried their backpacks. (*Id.* at 43, 52.) The backpacks weighed up to 25 to 30 pounds, and the students were about 80 to 90 pounds. (*Id.* at 52–53.) Williams spent at least five hours standing and walking out of a six-and-a-half-hour day. (*Id.* at 53.) After her injury, she could no longer work there because they would not accommodate her, and she had no reason to stop working other than her injury. (*Id.* at 43, 56.) She had also previously worked as a youth tennis instructor roughly five hours a week, year-round, and handled paperwork at that job. (*Id.* at 80.) Prior to her injury, Williams enjoyed golfing, horseback riding, and playing tennis. (*Id.* at 56.)

Williams testified she did not "do steps well," and it hurt to sit or stand for long. (*Id.* at 43.) She could sit for "15 minutes at the longest time. But between 10, seven to 10 minutes changing positions. Like it's been quite difficult sitting in one position [at the hearing]." (*Id.* at 44.) During the hearing, she had to shift from sitting to standing and had to remove her left shoe because it "throbs when anything rub[s] up against it." (*Id.* at 50, 53.) She could stand for about 15 to 20 minutes, and could walk for about a block with a cane, which she was prescribed in 2012 or 2013. (*Id.* at 43–44.) She had also been prescribed a back brace, which she was wearing at the hearing, and a TENS machine, both of which she used on a daily basis. (*Id.* at 53.) She could lift at most 15 to 20 pounds, but it was hard to lift children. (*Id.* at 44.)

Williams stated that, on an average day, she woke up, made a smoothie "because [she] usually [had] a lot of swelling and throbbing in the morning," and then elevated her foot. (*Id.* at 48.) The swelling occurred in her toes, ankles, and fingers, which would get numb, and she

would elevate her foot three or four times a day for 10 to 15 minutes, depending on how long it was throbbing, or longer if she felt her pulse in her foot. (*Id.* at 54.) She also received physical therapy for her left heel, soaked it, used a cream, and took Cymbalta as prescribed, which she described as a pain medication that "dulls the nerves." (*Id.* at 45.) Her mother visited a few times a week and assisted her with making lunch or dinner, doing laundry, and cleaning. (*Id.* at 48–49.) She did "limited" cooking and shopping for food. (*Id.* at 49.) Typical activities were using the computer, watching TV, listening to music, and going to the doctor. (*Id.* at 49–50.) She occasionally visited friends or relatives. (*Id.* at 50.) She tried to drive or get a ride to go places, because "[u]sing public transportation is an arduous task." (*Id.*) Williams "used to be very independent so [she] like[s] to do things by [her]self." (*Id.* at 49.)

For her foot, Williams had initially seen Dr. Lopez, a podiatrist, who instructed her that if the problem was "upstairs," he would not be able to assist her, but that if it was her foot, he could. (*Id.* at 48.) Williams testified, "it is my foot. But everyone is saying that it's my back." (*Id.*) Dr. Lopez sent Williams for an MRI, which resulted in Williams wearing a cast for a period of time. (*Id.* at 54–55.) He also ordered cortisone injections, but those were stopped in 2013 because Williams had "a very bad reaction." (*Id.* at 45, 55.) He advised Williams to go to an orthopedist "when he realized that [Williams] had pinched nerves." (*Id.* at 48.)

Dr. Singh, whom Williams also saw "generally for [her] foot," reviewed the MRI showing pinched nerves and "saw how [her] foot was swollen." (*Id.* at 51.) He initially prescribed Gabapentin, and then Voltaren, to relax her nerves, which caused side effects of dry mouth, dry eyes, and upset stomach. (*Id.* at 50–51, 55.) Dr. Singh advised her to go to an orthopedist. (*Id.* at 52.) Eventually, Dr. Ellen Edgar replaced Dr. Singh after he stopped accepting worker's compensation. (*Id.* at 51.) She advised Williams to see a podiatrist. (*Id.* at

47.) Dr. Edgar ordered an EMG/NCV study in August 2014, the findings of which were "very similar to the findings of the first test," presumably referring to her earlier MRI. (*Id.* at 55–56.) Dr. Edgar was also treating Williams for vestibular dysfunction, which Williams described as a problem with her ear that caused her to be "a little off balance at times." (*Id.* at 47.)

For Williams' lower back problems, she had seen Ronald Rose, a chiropractor, and an orthopedist, Dr. Gus Katsigiorgis. (*Id.* at 45–46.) Dr. Jeffries, a pain management doctor, suggested that Williams undergo spinal fusion in light of her reaction to injections, but she was reluctant to undergo surgery. (*Id.* at 44, 46.) Williams received chiropractic treatment and physical therapy three times a week, and used Ibuprofen and Mobicam for her back. (*Id.* at 46, 53–54.) She was advised physical therapy would also provide relief to her heel by treating her pinched nerves; however, she had not yet experienced such relief. (*Id.* at 54.)

Williams testified she filed an application for worker's compensation benefits, which involved a doctor's examination, as a result of which she received benefits dating back to January 2012, which she was still receiving at the time of the hearing. (*Id.* at 56–57.) She did not have income from any other source. (*Id.* at 57.)

Williams also responded to the ME's questions during the hearing. She indicated she had never received a diagnosis of plantar fasciitis. (*Id.* at 59.) She confirmed she had back pain that radiated down her left leg and pain in her left heel. (*Id.*) She had relief from the pain by elevating her foot if it was swollen, and she felt "great" if she didn't step on her heel at all by walking on her "tippy toes." (*Id.*) She could not, however, bear weight on her heel. (*Id.* at 60.)

**b.    Evidence Prior to Williams' December 20, 2012 Applications**

**i.    Gerald Shulze, M.D., February 27, 2012**

On February 27, 2012, Williams received an MRI of her ankle from Gerald Shulze, M.D.,

showing a small joint effusion in the tibiotalar joint.  (*Id.* at 436.)

### ii.  Mark Drakos, M.D., March 12, 2012

On March 12, 2012, Mark Drakos, M.D., evaluated Williams' left foot.  (*Id.* at 568.)
Williams reported she slipped and fell on a liquid while walking down the stairs, which led to
immediate pain, swelling, and difficulty walking.  (*Id.*)  At the time of her visit, she felt she was
"getting slowly better" but was experiencing shooting pain, numbness, and throbbing.  (*Id.*)

Williams could "toe walk," but had difficulty heel walking secondary to pain.  (*Id.*)  She
had functional range of motion in the hips, knees, and ankles; her deep tendon reflexes were
symmetric; and she had "5 out of 5" strength in dorsiflexion, plantarflexion, inversion, and
eversion.  (*Id.*)  Her hindfoot alignment was physiologic valgus.  (*Id.*)  Williams had pain
posterior medially, a mildly positive Tinel over the tarsal tunnel, and gastroc tightness.  (*Id.* at
569.)  X-rays and an MRI of the lower leg were reviewed, showing good overall alignment and
no obvious fractures.  (*Id.*)

Dr. Drakos assessed that Williams had possible tarsal tunnel syndrome.  (*Id.*)  He
recommended a formal consultation with a neurology specialist and prescribed an ultrasound-
guided injection for tarsal tunnel.  (*Id.*)

### iii.  Rajpaul Singh, M.D., March 19 – October 15, 2012

#### (A)  March 19, 2012

On March 19, 2012, Williams saw Rajpaul Singh, M.D., board-certified neurologist, at
Hillside Neurology Care, P.C.  (*Id.* at 321.)  Williams was referred for evaluation of injuries to
her left foot and ankle from falling on a wet staircase at work on December 8, 2011.  (*Id.*)  She
denied any head injury or loss of consciousness at the time of the fall.  (*Id.*)  She could not bear
weight on her left foot secondary to pain.  (*Id.*)

Williams complained of persistent pain and paresthesia[3] in her left foot and ankle area, which prohibited her from wearing shoes on that foot and was aggravated by bearing weight. (*Id.*)  Her pain was constant, sharp, and sticking, and rated an eight out of 10.  (*Id.*)  The paresthesia came and went, and varied in severity and duration.  (*Id.*)  Williams walked with the assistance of crutches.  (*Id.*)  She had tried Oxycodone and Ibuprofen for pain control, but they caused nausea.  (*Id.*)  Williams was not working at the time.  (*Id.*)  She reported no prior significant health problems, surgeries, or hospitalizations, and no family history of significant or pertinent health problems.  (*Id.* at 322.)

Williams' left ankle and foot displayed a moderate limp and were warm to the touch.  (*Id.* at 323.)  The skin on her left foot appeared slightly mottled in comparison to the right.  (*Id.*)  Pulses were intact distally, and color was normal.  (*Id.*)  Moderate to severe tenderness was present in the plantar and posterior calcaneus.  (*Id.*)  There was no swelling, obvious palpable bony deformity, effusion, masses, defects, crepitation, or calor.  (*Id.*)  Williams had moderate pain with dorsiflexion and plantar flexion.  (*Id.*)  Her muscle strength was +4/5 in the ankle flexors, ankle extensors, ankle everters, and ankle inverters.  (*Id.*)  Sensation was normal.  (*Id.*)  A light touch sensory examination revealed hypoesthesia in the left foot over the plantar aspect medial and lateral sides, proximal half only.  (*Id.*)  Deep tendon reflex in the left ankle was 1+, rather than normal (2+).  (*Id.* at 324.)  Williams was unable to perform a tandem gait.  (*Id.*)

Dr. Singh assessed that Williams had reflex sympathetic dystrophy ("RSD") of the left lower limb, paresthesia, and pain in left ankle and foot.  (*Id.*)  He prescribed Cymbalta,

---

[3] "Paresthesia refers to a burning or prickling sensation," usually described as "tingling or numbness, skin crawling, or itching," or a feeling of "pins and needles."  *Paresthesia Information Page*, NAT'L INST. OF NEUROLOGICAL DISORDERS AND STROKE, https://www.ninds.nih.gov/Disorders/All-Disorders/Paresthesia-Information-Page (last visited Aug. 31, 2018).  Paresthesia may be caused by several different disorders, including "underlying neurological disease or traumatic nerve damage," as well as "[n]erve entrapment syndromes, such as carpal tunnel syndrome, [which] can damage peripheral nerves and cause paresthesia accompanied by pain."  *Id.*

Gabapentin, and Naproxen for pain.  (*Id.*)  Ibuprofen was discontinued.  (*Id.*)

Williams' "work status" was noted as "unable to work," and her "disability level" was "total."  (*Id.*)  Dr. Singh requested authorization for EMG/NCS testing of the lower limbs.  (*Id.*) He noted that, assuming Williams' reported history was accurate, there was "a direct causal relationship between the patient's condition and the above mentioned accident" based on her symptoms, physical findings, and the absence of symptoms prior to the accident.  (*Id.* at 324–25.) Dr. Singh's prognosis was guarded.  (*Id.* at 325.)

*(B)*    *April 7, 2012 Form*[4]

A form signed by Dr. Singh, dated April 7, 2012, noted that Williams was not working and had first missed work due to her injury on December 8, 2011.  (*Id.* at 562.)  It stated she could not return to work because of persistent pain her left ankle and foot.  (*Id.*)

*(C)*    *April 18 – October 15, 2012*

Williams saw Dr. Singh for follow-up appointments on April 18, June 7, July 9, August 29, and October 15, 2012.  Williams consistently complained of constant pain and paresthesia in her left foot and ankle, which she described at various times as throbbing and burning, sore and nagging, or stabbing and sticking.  (*Id.* at 326, 331, 335, 339, 343.)  The severity of her pain was "moderate to severe" on April 18, five out of 10 on June 7, "severe" on July 9, and "moderate" on both August 29 and October 15.  (*Id.*)  Intermittent periods of paresthesia in her left foot varied in severity and duration, and were associated with pain.  (*Id.*)  Pain was aggravated by standing or walking for a long time, bearing weight, and climbing stairs.  (*Id.* at 331, 335, 339, 343.)  Williams was initially on crutches but began to use a cane on June 7 and continued to do

---

[4] The record appears to be incomplete, as "Page 4 of 4" is indicated in the lower, left-hand corner of the document, but the preceding three pages are not in the record.  (Admin. R. at 562.)  Based on similarities to other forms in the record, this appears to be a portion of a form for the State of New York Workers' Compensation Board.  (*See, e.g.*, *id.* at 302–03.)

so through October 15.  (*Id.* at 326, 331, 335, 339, 345.)  She consistently reported minimal or partial alleviation of her symptoms with medication without any side effects.  (*Id.* at 326, 335, 339, 343.)  Dr. Singh consistently noted at each visit that Williams' "disability level" was "total."  (*Id.* at 329, 334, 338, 342, 346.)  As to work ability, he noted she was unable to work for two months on April 18, made no note on June 7 or July 9, and noted "unable to work" on August 29 and October 15.  (*Id.*)  Cymbalta was discontinued on June 7, but Naproxen and Gabapentin were regularly refilled.  (*Id.* at 334, 338, 346.)  The treatment records were otherwise largely identical to the initial March 19 record, except as noted below.

On April 18, Williams complained of intermittent swelling in her left foot and ankle and reported she could not stand or walk for more than 20 minutes secondary to pain.  (*Id.* at 326.)  Her limp was now moderate to severe.  (*Id.* at 328.)  She was referred to physical therapy twice a week for four weeks.  (*Id.* at 329.)

On June 7, Williams' EMG/NCS test results were discussed with her, though they are not described in the treatment notes.  (*Id.* at 331.)  Williams had started physical therapy, which provided some pain relief.  (*Id.*)  Williams' antalgic gait improved to mild to moderate.  (*Id.* at 333.)  Her tenderness in the plantar and posterior calcaneus improved to mild to moderate, which was sustained throughout subsequent appointments, and her pain with dorsiflexion and plantar flexion also improved to mild to moderate.  (*Id.*)  Dr. Singh assessed that Williams had tarsal tunnel syndrome in addition to her RSD, paresthesia, and pain.  (*Id.* at 334.)

On July 9, Williams reported the paresthesia in her left lower extremity prevented her from sleeping at night.  (*Id.* at 335.)  Her left foot was now slightly colder compared to her right foot, which remained consistent at subsequent appointments.  (*Id.* at 337.)  Her lower left gastrocnemius was hypotrophic; her left calf girth measured 30.5 inches, while her right

measured 33, which remained consistent thereafter.  (*Id.*)  Williams' pain with plantar flexion

worsened to "moderate," which also remained consistent thereafter.  (*Id.*)

On October 15, Williams reported "a cold like sensation in the left foot."  (*Id.* at 343.)

Dr. Singh conducted an ECG and autonomic nervous system testing for cardiovagal, adrenergic,

and sudomotor function.  (*Id.* at 346.)  No test results are described.

Dr. Singh completed progress reports for the State of New York Workers' Compensation

Board regarding Williams' visits on July 9, August 29, and October 15, 2012.  These forms were

substantively identical, aside from the dates, prescription renewals, and noting any tests that had

been conducted.  (*Id.* at 302–03, 306–09.)  Dr. Singh listed diagnoses of RSD, pain in the left

ankle and foot, paresthesia of the left lower limb, and tarsal tunnel syndrome on each form.  (*Id.*

at 302, 306, 308.)  He consistently described his findings and diagnostic test results as, "Left

posterior tibial mononeuropathy distal to left ankle compatible with left tarsal tunnel syndrome.

Left S1 Radiculopathy."  (*Id.* at 303, 307, 309.)  In the "Doctor's Opinion" portion of the form,

Dr. Singh always answered, "Yes," to the following three questions:

- "In your opinion, was the incident that the patient described the competent medical cause of this injury/illness?"

- "Are the patient's complaints consistent with his/her history of the injury/illness?"

- "Is the patient's history of the injury/illness consistent with your objective findings?"

(*Id.*)  Dr. Singh identified Williams' percentage of temporary impairment as "100%."  (*Id.*)

In the "Return to Work" portion of the form, Dr. Singh consistently stated that Williams

was not working and could not return because of "persistent pain in left ankle/left foot."  (*Id.*)

### iv.    ADVANCED S.P.O.R.T.S., May 1 – June 19, 2012

On May 1, 2012, Williams received treatment for her left foot and ankle with 15 minutes

of therapeutic exercise, "terex act direct," and "joint mobs," with heat and ice. (*Id.* at 375.) She tolerated the treatment well. (*Id.*) On May 22 and June 19, 2012, Williams received the same treatment, with unattended electric stimulation on June 19. (*Id.* at 372–73.)

### v. Osafradu Opam, M.D., May 19, 2012

Williams was referred to Osafradu Opam, M.D., for evaluation of "left Tarsal Tunnel Syndrome or RSD/CRPS." (*Id.* at 505.)[5] Williams reported she fell down a wet staircase, sustaining injuries to her head, neck, low back, and left foot, without loss of consciousness. (*Id.*) She had a history of lower back pain radiating into both legs and her left foot, had had an unremarkable MRI, and was receiving physical therapy once or twice a week. (*Id.* at 299, 505.) Williams complained of pain and numbness in her left foot and pain in her left heel. (*Id.* at 505.)

Williams received NCV and EMG tests because her "symptoms and neurological signs raise the possibility of peripheral nervous system (nerve root, peripheral nerves) injury (irritation, compression, stretching)." (*Id.* at 299.) The NCV results were normal, except borderline slow latency was found in the left posterior tibial nerve. (*Id.*) The EMG found abnormal potentials in the left S-1 paraspinals and the left medial gastrocnemius and abductor digiti quinti muscles. (*Id.*) The report's conclusion stated, "1. Left Posterior Tibial mononeuropathy distal to left ankle compatible with left tarsal tunnel syndrome. 2. Left S-1 radiculopathy." (*Id.*) The recommendations were, "1. Clinical correlation. 2. MRI L/S spine. 3. MRI left Ankle." (*Id.*)

### vi. Edward L. Mills, M.D., F.A.A.O.S., F.A.C.S., June 18, 2012

Edward L. Mills, M.D., F.A.A.O.S., F.A.C.S., board-certified orthopedic surgeon, was asked to perform a consultative orthopedic exam. (*Id.* at 367.)

---

[5] Complex regional pain syndrome ("CRPS") is divided into two types, the first of which is also known as RSD. *Complex Regional Pain Syndrome Fact Sheet*, NAT'L INST. OF NEUROLOGICAL DISORDERS AND STROKE, https://www.ninds.nih.gov/Disorders/ Patient-Caregiver-Education/Fact-Sheets/Complex-Regional-Pain-Syndrome-Fact-Sheet (last visited Aug. 31, 2018).

Williams reported that she slipped on clear liquid while walking down a staircase at work on December 8, 2011, and sustained injuries to her left foot and ankle, without loss of consciousness. (*Id.*) Williams visited Dr. Khan the next day. (*Id.*) She did not sustain any fractures or lacerations. (*Id.*) Under the care of various physicians, she initiated a course of physical therapy, massage therapy, and heat and ice treatments twice a week, which she was continuing at the time of the exam. (*Id.* at 368.) Williams had had X-rays, MRIs, and CT scans. (*Id.*) She needed to use a cane and crutches but did not undergo any surgery. (*Id.*) Williams had received "left foot injection" but did not have any pending injections, and she was not taking any medication at the time. (*Id.*) Her mother drove her to doctor's appointments. (*Id.*) She stated, "Although I am in pain, I am able to stand on my heel yet unable to take pain when I walk on it." (*Id.* at 368–69.) She was not working as a result of the accident. (*Id.* at 369.)

Williams complained of pain in her left ankle and foot, which had improved since the fall. (*Id.*) She was limping and using a cane. (*Id.*) Her range of motion in her left ankle and foot was "dorsiflexion to 0 degrees (20 degrees normal) plantarflexion to 20 degrees (40 degrees normal), inversion to 5 degrees (30 degrees normal), and sub eversion to 5 degrees (20 degrees normal)." (*Id.*) Williams complained of diffuse tenderness. (*Id.*)

Dr. Mills' diagnosis and impression was "Left ankle sprain/strain, possible non-union fracture – resolving." (*Id.* at 370.) With respect to disability, he wrote, "There is evidence of a mild partial orthopaedic disability of 25%." (*Id.*) He concluded Williams "is capable of working with restrictions to be placed on no prolonged walking or standing." (*Id.*) He also stated there was "no need for physical therapy, as it would be considered palliative and not curative." (*Id.*) There was "an indication for diagnostic testing consisting of CT scans of her left ankle/foot to rule out possible non-union with possible RSD or Chronic Regional Pain Syndrome." (*Id.*)

### c. Evidence After Williams' December 20, 2012 Applications

#### i. Rajpaul Singh, M.D., January 2, 2013 – March 20, 2014

Williams saw Dr. Singh on January 2, February 21, April 10, April 24, July 17, September 18, and November 20, 2013, and on January 30 and March 20, 2014. She consistently complained of pain in her left foot and ankle, which she described as constant, nagging, sore, and aching. (*Id.* at 389, 393, 397, 401, 405, 447, 451.) At various times, she reported that her pain was aggravated by standing and walking for a long time, climbing up stairs, and bearing weight, and that pain was associated with periods of paresthesia. (*Id.* at 389, 393, 397, 443, 447, 451, 455.) The severity of her pain varied with no clear trend.[6] At her latest visit on March 20, 2014, her pain was sharp and burning and rated eight out of 10. (*Id.* at 455.) She consistently reported paresthesia in periods of varying severity and duration. (*Id.* at 389, 393, 397, 401, 405, 443, 447, 451, 455.) Williams' prescription for Naproxen was discontinued on January 2, 2013, and thereafter, she was consistently prescribed Gabapentin, Tramadol, and Voltaren. (*Id.* at 392, 400, 404, 408, 446, 458.) Medication consistently provided short-term relief from her symptoms without side effects. (*Id.* at 389, 393, 397, 401, 405, 443.)

On January 2, 2013, Dr. Singh assessed that Williams suffered from "Idiopathic peripheral autonomic neuropathy, unspecified," on the left side, in addition to RSD, paresthesia, pain in left ankle/foot, and tarsal tunnel syndrome. (*Id.* at 408.) He completed a progress report for worker's compensation that was substantially identical to prior forms. (*Id.* at 304–05.) On January 2 and February 21, 2013, Dr. Singh stated that Williams was "unable to work" and that her disability level was "total = 100%." (*Id.* at 404, 408.) Use of a cane is last mentioned on

---

[6] Williams' pain was a seven out of 10 on January 2, 2013 (Admin. R. at 405), eight of 10 on February 21 (*id.* at 401), "moderate" on April 10 (*id.* at 397), "mild to moderate" on April 24 (*id.* at 393), "moderate" on July 17, September 18, and November 20 (*id.* at 389, 443, 447), and "moderate to severe" on January 30, 2014 (*id.* at 451).

February 21.  (*Id.* at 401.)

Also on February 21, Dr. Singh completed two forms.  One appears to be a leave application, noting a duration of leave from February 21 to April 2, 2013.  (*Id.* at 310.) Dr. Singh certified that between June 28, 2012, and June 30, 2013, Williams would be "incapacitated for school duties" due to RSD.  (*Id.*)  For the second form, only the third page, concerning medical history, is in the record.  (*Id.* at 311.)  He described Williams as a "36 year old female with left RSD – Reflex Sympathetic Dystrophic – Ambulates with cane due to poor balance/coordination 2d to pain/paresthesias in the left foot."  (*Id.*)  "She is unable to walk for distances due to constant pain/paresthesias in the left foot."  (*Id.*)  He noted that the disability was permanent and required her to use a private automobile for transportation.  (*Id.*)

On April 10, 2013, Williams reported she wanted to return to work although she was still experiencing symptoms.  (*Id.* at 397.)  Dr. Singh's assessment omitted paresthesia and pain in the left ankle and foot, leaving diagnoses of only RSD, tarsal tunnel syndrome, and idiopathic peripheral autonomic neuropathy.  (*Id.* at 400.)  Under "work status," he noted, "return to regular duty.  Estimated date for return to work 4/15/13.  MMI has been reached."  (*Id.*)  No disability level was noted.  (*Id.*)

On April 24, 2013, Williams said she wanted to return to work, but her job would not take her back with any limitations.  (*Id.* at 393.)  She appeared chronically ill in mild distress, which was consistently noted in subsequent reports.  (*Id.* at 394.)  Dr. Singh added paresthesia and pain in the left ankle and foot back to his assessment of Williams' current problems with the notation, "Condition: unchanged."  (*Id.* at 396.)  Under work status, he wrote, "unable to work," and under "disability level," he wrote, "moderate partial = 50%," which remained the same throughout the remainder of his reports.  (*Id.* at 392, 396, 446, 450, 454, 458.)

On September 18, 2013, Dr. Singh noted for the first time that Williams had a history of low back pain, for which she had an EMG/NCV study in 2012, revealing left lumbar radiculopathy and mononeuropathy of the left lower limb. (*Id.* at 443.) He assessed that Williams suffered from lumbar radiculopathy in addition to previous diagnoses. (*Id.* at 446.)

On November 20, 2013, Williams complained of headaches and dizziness for the past several months. (*Id.* at 447.) Her headaches were in the frontal area, throbbing in nature, rated of moderate severity, and were associated with nausea, photophobia, and phonophobia. (*Id.*) They occurred about three times a week, lasted for several hours, and disrupted her daily activities. (*Id.*) Williams had been taking over-the-counter analgesics without relief. (*Id.*) Her dizziness, which she described as a spinning sensation, came and went and was worse when she rapidly changed positions. (*Id.*) Dr. Singh noted, "Ears: dizziness," and "difficulty walking; headache; numbness; spinning sensation; and tingling or 'pins and needles' sensation." (*Id.*) A psychiatric review showed, "Pain behaviors: facial grimacing, verbalization, slow guarded movement." (*Id.* at 449.) Dr. Singh assessed RSD, postconcussion syndrome, headache, and vertigo, with no other previous diagnoses. (*Id.*) He indicated that benign paroxysmal positional vertigo should be ruled out and requested a brain MRI. (*Id.* at 450.)

On January 30, 2014, Williams complained of pain and paresthesia in the left ankle and foot, as well as frequent headaches and dizziness, which she had continued to have since her last visit. (*Id.* at 451.) The headaches, triggered by stress, bright lights, and loud noises, were unilateral, pounding and throbbing, and rated moderate in severity. (*Id.*) They occurred one to three times a week. (*Id.*) Williams' dizziness was the same as previously reported. (*Id.*)

On March 20, 2014, Williams complained of pain and paresthesia in the left ankle and foot, as well as headaches, dizziness, and neck and low back pain. (*Id.* at 455.) She had

17

experienced intermittent headaches and dizziness since her last visit.  (*Id.*)  Her headaches were

alleviated with Motrin and sleep.  (*Id.*)  Williams' neck pain traveled to her upper arms, was sore

and nagging in nature, and rated of moderate severity.  (*Id.*)  Pain increased with turning her head

to the sides.  (*Id.*)  She also had pain in her low back that radiated to her lower limbs, which

increased with climbing up the stairs, bending, squatting, and twisting to the sides.  (*Id.*)  A spine

palpation showed moderate muscle tenderness bilaterally in a symmetrical distribution in the

sternocleidomastoid, the trapezius, C4-C5, C5-C6, C6-C7, paraspinous muscles, L4-L5, and L5-

S1.  (*Id.* at 457.)  Dr. Singh added cervicalgia and lumbago to the problems he assessed on

November 20, 2013.  (*Id.* at 458.)  He referred Williams to a pain management specialist for

"possible injection in the low back."  (*Id.*)

### ii.    Chaim Shtock, D.O., March 5, 2013

Chaim Shtock, D.O., performed a consultative orthopedic examination for the Division of

Disability Determination.  (*Id.* at 381.)  Williams stated she fell on a wet staircase, sustaining

injury to her left foot and lower back.  (*Id.*)  The next day, she was seen by her primary

physician, who examined her and referred her for a podiatrist consultation.  (*Id.*)  She saw a

podiatrist on December 19, 2011, who referred her for an X-ray.  (*Id.*)  She was diagnosed with

calcaneal fracture and had a cast for three months.  (*Id.*)  She complained to her podiatrist of pain

her left calcaneal area, and he cut a hole in that aspect of the cast.  (*Id.*)  After the cast was

removed, Williams was referred for physical therapy three times a week and had 16 visits.  (*Id.*)

Williams had previously been examined by an independent medical examiner, and her physical

therapy was stopped.  (*Id.*)  In April 2012, she was seen by a neurologist and diagnosed with

RSD.  (*Id.*)  In May 2012, she had NCV/EMG testing done by a neurologist and was referred

with left tibial mononeuropathy distal to the left ankle compatible with a left tarsal tunnel

syndrome. (*Id.*) She was also diagnosed with left S1 radiculopathy. (*Id.*)

Williams presented with left heel pain, rated at four of 10 at rest, and nine to 10 of 10 with standing, walking, and taking stairs. (*Id.*) The pain was dull, stiff, and throbbing, with occasional numbness in the left foot. (*Id.*) The pain was relieved by rest, refraining from aggravating activities, and medication. (*Id.*) Williams also presented with lower back pain, rated a six to seven of 10. (*Id.*) It was a dull, daily ache, aggravated by prolonged walking, and relieved by rest, refraining from aggravating activities, and medication. (*Id.* at 381–82.) Williams' current medications were listed as Tramadol, Naproxen, and Gabapentin. (*Id.* at 382.)

Williams lived alone and was independent with showering, dressing, and grooming, as well as light cooking and cleaning. (*Id.*) She watched TV, listened to the radio, read books, and socialized with friends. (*Id.*) Her mother visited and helped with laundry and shopping. (*Id.*)

Williams did not appear to be in acute distress. (*Id.*) She walked with an antalgic gait and on her toes on her left foot. (*Id.*) She did not use an assistive device, and station was standing on the left toes. (*Id.*) She could not put pressure on her left heel, where she experienced her main pain, and she could not squat beyond 80% capacity. (*Id.*) She did not need help changing for the exam or getting on or off the exam table, and she was able to rise from a chair without difficulty. (*Id.* at 382–83.)

An exam of Williams' spine was normal except for tenderness in the lumbar paraspinals. (*Id.* at 383.) Her straight leg raise ("SLR") test was positive on the left at 35 degrees seated. (*Id.*) Williams had limited range of motion in her left hip and leg. Her left hip had flexion of 90 degrees and internal/external rotation of 30 degrees, and her left ankle had dorsiflexion of 10 degrees and plantar flexion of 30 degrees. (*Id.*) Strength in her left leg was 4+/5 proximal to 4/5 distal muscles. (*Id.*) She had greater tenderness in the medial than in the lateral inner aspect of

her left heel, and she had tenderness in the plantar aspect of the left heel. (*Id.*) Positive mild muscle atrophy was noted in the left calf muscle. (*Id.*) She had decreased light touch sensation in the left leg. (*Id.*) Williams had paresthesia around the left heel. (*Id.*) Her reflexes were physiologic and equal, and she had no joint effusion, inflammation, or instability. (*Id.*)

Dr. Shtock listed seven diagnoses: left heel and foot pain; weakness and limited range of motion in the left ankle; RSD in the left heel, left foot, and left ankle; "work-related injury;" reported history of lower back pain; reported history of allergies; and gait dysfunction. (*Id.* at 384.) His prognosis was guarded. (*Id.*)

Dr. Shtock provided the following medical source statement:

> The claimant has moderate to marked limitations with heavy lifting. She has mild limitations with squatting, kneeling, and crouching. She has marked limitations with frequent stair climbing. She has marked limitations walking long distances and moderate to marked limitations with standing long periods. Marked limitations with sitting long periods. She has mild limitations with frequent bending. She has no limitations performing overhead activities using both arms. She has no limitations using her hands for fine and gross manual activities. The claimant has no other physical functional deficits in my opinion.

(*Id.*)

### iii. Gus Katsigiorgis, D.O., July 5, 2013 – March 20, 2014

#### (A) July 5, 2013

Williams, referred by Dr. Khan, saw Gus Katsigiorgis, D.O., on July 5, 2013, complaining of low back and ankle pain. (*Id.* at 508.) On December 8, 2011, she had fallen down the steps at work and injured her low back and left ankle. (*Id.*) She had been having low back pain radiating down the left leg to the foot with some numbness and tingling, as well as pain about the left ankle and foot. (*Id.*) Williams was not working because of her injury. (*Id.*)

Williams' left ankle was tender and swollen but was neurovascularly intact. (*Id.*) She complained of numbness and tingling in her left foot, and her lumbar spine had paraspinal

muscle tenderness.  (*Id.*)  Her SLR was positive on the left, and she walked with an antalgic gait.  (*Id.*)  She had limited range of motion in her left ankle, left foot, and lumbar spine.  (*Id.*)

Dr. Katsigiorgis diagnosed lumbar sprain and left foot tarsal tunnel syndrome.  (*Id.*)  He requested an MRI of her foot and lumbar spine for further evaluation.  (*Id.*)  He recommended restricted activities and physical therapy.  (*Id.*)

### (B)    July 17, 2013

A form reflecting Williams' range of motion signed by Dr. Katsigiorgis on July 17, 2013, shows notations for less than full range of motion in Williams' back and left ankle.  (*Id.* at 499.)[7]

### (C)    November 18, 2013 – March 20, 2014

Williams saw Dr. Katsigiorgis again on November 18 and December 26, 2013, and March 20, 2014, and those records reflected the same issues identified on July 5, 2013.  (*Id.* at 494, 488, 474.)[8]  On March 20, 2014, Dr. Katsigiorgis recommended consulting a foot and ankle specialist, a neurosurgeon, a neurologist, and a pain management specialist.  (*Id.* at 474.)

### iv.    Mark Decker, M.D., D.A.B.R., July 8–15, 2013

### (A)    July 8, 2013

Mark Decker, M.D., D.A.B.R., board-certified radiologist, conducted a fast spin echo of Williams' left foot, as requested by Dr. Katsigiorgis, based on Williams' history of pain.  (*Id.* at 506.)  Dr. Decker's impression was that Williams had no tear or fracture.  (*Id.* at 507.)

### (B)    July 15, 2013

On July 15, 2013, Dr. Decker conducted an MRI of Williams' lumbar spine, as requested

---

[7] The specific notations are illegible.  There are additional similar, undated forms in the record.  (Admin. R. at 475, 487, 495.)  They show similar markings, except that one record has notations regarding Williams' right ankle rather than her left, which may be in error.  (*Id.* at 475.)

[8] On March 20, 2014, the notes refer to the "right" foot and ankle, but this is presumably in error.  (Admin. R. at 474.)

by Dr. Katsigiorgis, based on Williams' history of low back pain.  (*Id.* at 437.)  Dr. Decker found a broad bulge at L4-L5, with mild foraminal encroachment by bulge and facet arthropathy, as well as facet arthropathy at L5-S1.  (*Id.*)  Dr. Decker's impression was "multilevel bulging and facet arthropathy with resultant mild foraminal encroachment, L4-L5.  No herniation or fracture."  (*Id.* at 438.)

<strong>v.      Island Musculoskeletal Care, November 6, 2013 – April 2, 2014</strong>

*(A)      November 6, 2013*

Williams was evaluated by Jennilyn Munda, RPT, on November 6, 2013.  (*Id.* at 492.)  She complained of extreme pain, swelling, and numbness on the left ankle and foot and had difficulty standing, walking, and taking stairs.  (*Id.*)  Her pain was seven of 10 at rest, and nine of 10 with movement.  (*Id.*)  She could walk without assistance.  (*Id.*)  She had "+3 Considerable" tenderness (on a scale of +1 to +4) in her left ankle and foot.  (*Id.*)  She had an antalgic gait, tightness on the left heel cord and calf, and decreased standing and walking tolerance.  (*Id.*)

Williams' active range of motion in her left ankle was 26 degrees for plantar flexion, 10 degrees for dorsiflexion, 16 degrees for inversion, and seven degrees for eversion.  (*Id.*)  Her manual muscle testing was "2+/5" for all four motions.  (*Id.*)  Treatment included active range of motion, ambulation, electrical stimulation, resistance, ultrasound, myofascial, stretching, plyometric, balance, heat/cold, and home exercise program.  (*Id.*)  Williams was diagnosed with "Sprain/Strain L Spine" and tarsal tunnel syndrome, which were noted as "not treated."  (*Id.* at 493.)  Treatment was prescribed three times a week for six weeks.  (*Id.*)

*(B)      November 9 – December 23, 2013*

A progress note completed by Ms. Munda on November 9, 2013, indicated Williams had treatments of "Hot/Cold Paks," electric stimulation, exercises, ultrasound, and myofascial.  (*Id.*)

Pain was rated six of 10 at rest, and eight of 10 with movement.  (*Id.*)  Williams reported persisting pain and stiffness in her left foot, felt when standing on one leg and when moving from sitting to standing or vice versa.  (*Id.*)  She walked without assistance with an antalgic gait and had tenderness in her left foot joints.  (*Id.*)  She had tightness of the heel cord and decreased range of motion on all planes of movement, with pain felt at the end of the range of motion.  (*Id.*)  She also had decreased strength of the left foot muscles and decreased standing and walking tolerance.  (*Id.*)  Williams tolerated treatment well without increased pain or symptoms.  (*Id.*)  She demonstrated difficulty in unilateral weight bearing.  (*Id.*)

On November 12, December 11, December 13, and December 23, 2013, either Ms. Munda or Armando Gayas, RPT, completed progress notes for Williams that were substantially identical to that of November 9.  (*Id.* at 486, 489–91.)

### (C)    March 18 – April 2, 2014

Ms. Munda completed a new evaluation on March 18, 2014.  (*Id.* at 476.)  Williams complained of cramping and aching pain in her low back area and was having difficulty in forward bending and stooping.  (*Id.*)  Her pain was a five of 10 at rest, and eight of 10 with movement.  (*Id.*)  The form reflects both "+2 Moderate" and "+3 Considerable" tenderness in her left ankle and foot.  (*Id.*)  She had an antalgic gait, spasm noted on the lumbar paraspinals, tightness on the hamstring and left heel cord and calf, and poor to fair standing and walking tolerance.  (*Id.*)  Williams' active range of motion in her lumbar was 28 degrees for flexion, 16 degrees for extension, and 22 degrees for both left and right rotation.  (*Id.*)  Her manual muscle testing was 2+/5 for all four motions.  (*Id.*)

Progress reports completed by Ms. Munda on March 21, March 28, and April 2, 2014, reflected substantially the same information as previous treatment records.  (*Id.* at 471–73.)

### vi.      Joseph C. Elfenbein, M.D., April 8, 2014

Joseph C. Elfenbein, M.D., board-certified orthopedic surgeon, performed a consultative re-examination of Williams on April 8, 2014.  (*Id.* at 462, 478.)  Williams reported she sustained injuries to her head, neck, back, buttocks, and left foot when she fell down a wet staircase at work on December 8, 2011.  (*Id.* at 462.)  She did not seek emergency care but saw Dr. Khan the next day.  (*Id.* at 462–63.)  She had a foot fracture with no lacerations.  (*Id.* at 463.)

Williams came under the care of Dr. Singh, Dr. Davies, and Dr. Katsigiorgis, who initiated a course of physical therapy, massage therapy, and heat and ice treatments twice a week, and issued her a TENS unit.  (*Id.*)  Williams indicated the therapy hurt her foot and that her back therapy had just begun, but she was continuing the recommended treatment at the time.  (*Id.*)  Williams had had X-rays, MRIs, and CT scans of her neck.  (*Id.*)  She required the use of a cane as a result of the incident.  (*Id.*)  She had not had surgeries but was pending lumbar sympathetic block surgery.  (*Id.*)  She had received injection to her left foot but did not have pending injections.  (*Id.*)  Her mother drove her to doctor's appointments.  (*Id.*)  Williams was taking Gabapentin, Tramadol, Ibuprofen, and Voltaren.  (*Id.*)

Williams was working full-time as a paraprofessional at the time of the accident, following students around school and sitting in class.  (*Id.* at 464.)  She was not working as a result of the accident but anticipated returning to work when her pain was better.  (*Id.*)

Williams complained of pain in her neck, lower back, and left ankle and foot, which had worsened.  (*Id.*)  She had sharp, throbbing pain with stiffness in her back, which was worse at night.  (*Id.*)  Pain was aggravated by movement, inactivity, sleeping, and stress.  (*Id.*)  Williams walked with a limping gait and was using a new cane.  (*Id.*)  She was able to take off her shoes without difficulty, sit comfortably, ascend and descend from the exam table, and dress and

undress her outerwear without assistance.  (*Id.*)

Williams' cervical spine was normal on examination.  (*Id.* at 465.)  Her lumbar spine had mild muscle spasm upon palpation on the left.  (*Id.*)  Her range of motion demonstrated "flexion to 90 degrees (60 degrees normal)" and "extension to 15 degrees (25 degrees normal)."  (*Id.*)  Her SLR was at 80 degrees.  (*Id.*)  Neurological examination of Williams' legs showed no atrophy, muscle strength in each range at +5/5, and deep tendon reflexes at 2+.  (*Id.*)  Sensation to light touch was within normal limits.  (*Id.*)  Heel-toe-walk was negative.  (*Id.*)

Williams' left ankle and foot had no heat, effusion, or erythema, but there was swelling. (*Id.*)  She had a range of motion of "dorsiflexion to 5 degrees (20 degrees normal), plantarflexion to 5 degrees (40 degrees normal), sub inversion to 5 degrees (30 degrees normal), and sub eversion to 5 degrees (20 degrees normal)."  (*Id.*)

Dr. Elfenbein's diagnoses and impressions were "Cervical spine sprain/strain – resolved," "Lumbar spine sprain/strain – resolving," "[Left] ankle/foot sprain/strain – resolving."  (*Id.* at 466.)[9]  With respect to disability, Dr. Elfenbein noted, "There is evidence of a mild further causally related orthopedic disability of 25%."  (*Id.*)  He concluded Williams was "capable of working with restrictions to be placed on no prolonged walking, standing, or sitting, no heavy lifting over 25 pounds, and no kneeling or squatting."  (*Id.*)  He stated, "Permanency is not applicable at the present time [] because the claimant warrants further treatment," noting that Williams had "not reached maximum medical improvement."  (*Id.* at 466–67.)

For Williams' lumbar spine and left foot, Dr. Elfenbein recommended continued physical therapy three times a week for six weeks.  (*Id.*)  There was "an indication for MRI study of her lumbar spine," and Dr. Elfenbein also referred Williams to a foot and ankle specialist.  (*Id.*)  For

---

[9] The record says "Right ankle/foot," but this is presumably in error, as issues with only the left ankle are noted.

the cervical spine, Dr. Elfenbein found that no further orthopedic treatment was required.  (*Id.*)

### vii.    Videonystagmography ("VNG") Interpretation, July 9, 2014[10]

A VNG was conducted, including tests of the central and peripheral nervous system, control of eye movements, and vestibular apparatus.  (*Id.* at 580.)  Visual pursuit tests showed abnormal gain and abnormal phase.  (*Id.*)  The ocular motor test showed abnormal delay, a "central ocular motor finding."  (*Id.*)  The optokinetic test produced no rightward nystagmus, which was also a central ocular motor finding.  (*Id.*)

The VNG evaluation was abnormal, and the findings were consistent with central vestibular dysfunction.  (*Id.*)  A review of then-current medications to establish any relationships with Williams' symptoms was indicated.  (*Id.*)  Considering Williams' medical history, the findings were non-localized and may have been caused by Williams' inattention or non-specific age-related changes or medications.  (*Id.*)  Clinical correlation was recommended, as well as balance rehabilitation and further evaluation by a neurologist if symptoms persisted.  (*Id.*)  Further investigation through brain MRI and lab work may have been needed.  (*Id.*)

### viii.    Ellen Edgar, M.D., August 14, 2014

Ellen Edgar, M.D., board-certified neurologist and neurophysiologist, made EMG and NCV findings from tests conducted on August 14, 2014.  (*Id.* at 579.)  Dr. Edgar's impression was that the electrodiagnostic study revealed evidence of superimposed acute bilateral L5 and S1 radiculopathy without active denervation.  (*Id.*)  There was no electrophysiologic evidence of peripheral neuropathy.  (*Id.*)  Clinical and radiological correlation was recommended.  (*Id.*)

---

[10] The signature on this report is illegible.  It appears to be dated July 29, 2014, but the date of service is listed as July 9, 2014.  (Admin. R. at 580.)

### ix.     Matthew Diament, M.D., May 19, 2015

Williams was evaluated for disc herniation due to chronic increasing lower back pain with left-sided radicular symptoms.  (*Id.* at 15.)  An MRI of the lumbar spine was conducted.  (*Id.*)  At L3-L4, there was a disc bulge resulting in bilateral neural foramen stenosis with posterior facet hypertrophy.  (*Id.*)  The findings were most concordant with a 4x3 millimeter synovial cyst along the anteromedial margin of the right L3-L4 posterior facet articulation, deep to the ligamentum flavum.  (*Id.*)  At L4-L5 and L5-S1, disc bulges resulted in bilateral neural foramen stenosis with posterior facet hypertrophy.  (*Id.*)

### x.     Michael Jurkowich, M.D., June 24, 2015

Michael Jurkowich, M.D., board-certified physiatrist, signed a letter dated June 24, 2015, stating that Williams had been under the care of their office since early 2014.  (*Id.* at 583.)[11]  Williams was suffering from painful RSD of the left leg and foot.  (*Id.*)  She had been undergoing comprehensive treatment, including multiple medications and physical therapy.  (*Id.*)  Her condition made it "difficult to perform her duties at her job."  (*Id.*)

### d.     Hearing Testimony from Experts

### i.     Chaim Eliav, M.D., Medical Expert

Chaim Eliav, M.D., testified as a medical expert in the hearing before the ALJ.  (*Id.* at 60–81.)  He stated that Williams "has a problem with her heel.  However, . . . the diagnoses concerning that heel seem to be inconsistent with – for lack of a better description, medical teaching."  (*Id.* at 60.)  He concluded, "It's possible that she has what is called tarsal tunnel syndrome in the left ankle/foot."  (*Id.* at 61.)

In considering whether Williams had vestibular dysfunction, the ME noted that Williams'

---

[11] The document suggests that Dr. Jurkowich is affiliated with Dr. Edgar.

VNG report on July 9, 2014, was positive for possible central findings; however, he did not find any indication of those findings in "today's report"[12] or any history that would support such findings. (*Id.*) He noted that he did not see indications of Hallpike findings or vertigo, which made it difficult for him to conclude there were any gross problems. (*Id.* at 61–62.)

With respect to lumbar impairment, the ME noted that Williams' lumbar spine MRI, dated July 15, 2013, indicated an L4-L5 bulge with no herniated disc, which did not show any gross damage to neural elements. (*Id.* at 62.) An EMG dated May 19, 2012, reported S1 radiculopathy on the left and mononeuropathy indicating tarsal tunnel. (*Id.*) An EMG on August 14, 2014, showed nerve conductions were normal, no peripheral neuropathy, and no acute denervation. (*Id.*) There were polyphasics, which could indicate old nerve lesions but not active nerve lesions. (*Id.*) "In other words, there was a problem in the past." (*Id.*) There were no acute findings and no mention of lumbar impairment after August 14, 2014. (*Id.* at 63.)

The ME elaborated that a specific sentence in the 2014 EMG report was "very strange." (*Id.*) It read, "the above electrodiagnostic study reveals evidence of superimposed acute bilateral L5 and S1 radiculopathy without active denervation." (*Id.*) The ME explained, "[a]cute means now," and thus, "to have acute radiculopathy [], you have to have active denervation," so the sentence contradicted itself. (*Id.*) The ME found that there was nothing in the results of the August 2014 EMG/NCV that supported a finding of radiculopathy. (*Id.* at 64.) He noted again that polyphasic eventuals might indicate something "in the distant past," but he concluded that nothing showed active radiculopathy. (*Id.*) He also noted that Williams' elevation of her feet several times a day "would speak against the radiculopathy." (*Id.* at 77.)

The ME testified that Williams' diagnosis of RSD also was not supported by the record.

---

[12] It is not clear what report he references here.

(*Id.* at 68.)  With RSD, "you would have the swelling of the entire foot.  It would be shiny skin. It would be so tender that you couldn't wear a shoe.  . . .  Even the sheets touching it would be extraordinarily painful.  Moreover, imaging studies would indicate developing osteopenia or osteoporosis." (*Id.* at 69.)  Williams' record reflected "no atrophy, no heat, [erythema] – which is redness.  . . .  There is a note that there is swelling.  However, the issue of the heel in particular is a limited distribution that would not be consistent with RSD." (*Id.* at 68–69.)  He did note that "people with problems with nerve endings such as tarsal tunnel do get RSD." (*Id.* at 69.)

The ME concluded that the severe medical impairment Williams had was tarsal tunnel syndrome but that it did not meet or equal a listing. (*Id.* at 64–65.)  He did agree with Williams that her ability to perform work functions was affected. (*Id.* at 65.)  She could lift and carry 10 pounds frequently and 20 pounds on occasion. (*Id.*)  Standing and walking was limited to two hours a day, cumulatively, and she would need a five-minute break after an hour. (*Id.*)  Sitting was limited to six hours and would also require a five-minute break after an hour. (*Id.* at 65–66.)  She should not do ladder climbing. (*Id.* at 66.)  Operating foot controls, and pushing and pulling with the arms, could be done occasionally with weight restrictions in mind. (*Id.* at 66–67.)  She could finger, feel, grasp, and reach in all directions. (*Id.* at 67.)  She could occasionally use stairs and ramps, kneel, stoop, or crouch, but could not crawl. (*Id.*)  Balancing could be done occasionally, but she should not be in any unprotected heights. (*Id.*)  "Offhand," the ME did not see being exposed to moving mechanical parts as an issue. (*Id.* at 68.)  Williams' ankle and foot should avoid exposure to vibration. (*Id.*)

### ii.      Andrew Pasternak, Vocational Expert

Andrew Pasternak, a vocational expert, testified that Williams' prior work as a paraprofessional was categorized as "light" by the Dictionary of Occupational Titles, but was

likely "in the medium range" as performed.  (*Id.* at 82.)  The VE testified that a person with the functional limitations described by the ME could not perform Williams' past relevant work "at all."  (*Id.* at 83.)  That person could, however, work as a receptionist, with just under 900,000 jobs in the national economy; credit card interviewer, with 202,000 jobs; or lens inserter, with 239,000 jobs.  (*Id.* at 83–84.)  The VE testified that whether Williams would be able to elevate her legs for 10 to 15 minutes two or three times a day "would be at the beneficence of the employer," but that "it's not normally allowed."  (*Id.* at 85.)  If she required 10-minute breaks every hour, she could not perform "competitive work employment."  (*Id.* at 86.)

### III.     The ALJ's Decision

The ALJ concluded that Williams was not disabled within the meaning of the Social Security Act from January 24, 2012, through the date of his decision, February 23, 2015.  (*Id.* at 21.)  He found that Williams had not engaged in substantial gainful activity since the alleged onset date of January 24, 2012.  (*Id.* at 23.)  Williams had one severe impairment, tarsal tunnel syndrome, which imposed more than mild limitations on basic work activities.  (*Id.*)  The ALJ then found that Williams did not have an impairment or combination of impairments that met or medically equaled the severity of a listed impairment.  (*Id.* at 24.)  As described in further detail below, the ALJ found that Williams could not perform her past relevant work, but that she had the residual functional capacity ("RFC") to perform a broad range of sedentary work, including jobs existing in significant numbers in the national economy.  (*Id.* at 25, 29–30.)

## STANDARD OF REVIEW

### I.     Review of Denial of Social Security Benefits

When reviewing the final determination of the Commissioner, the Court does not make an independent determination about whether a claimant is disabled.  *Schaal v. Apfel*, 134 F.3d

496, 501 (2d Cir. 1998). Rather, the Court "may set aside the Commissioner's determination that a claimant is not disabled only if the [ALJ's] factual findings are not supported by 'substantial evidence' or if the decision is based on legal error." *Shaw v. Chater*, 221 F.3d 126, 131 (2d Cir. 2000). "'[S]ubstantial evidence' is 'more than a mere scintilla. It means such relevant evidence as a reasonable mind might accept as adequate to support a conclusion.'" *Selian v. Astrue*, 708 F.3d 409, 417 (2d Cir. 2013) (quoting *Richardson v. Perales*, 402 U.S. 389, 401 (1971)).

"In determining whether the agency's findings were supported by substantial evidence, the reviewing court is required to examine the entire record, including contradictory evidence and evidence from which conflicting inferences can be drawn." *Id.* (internal quotation marks omitted). "If there is substantial evidence in the record to support the Commissioner's factual findings, they are conclusive and must be upheld." *Stemmermann v. Colvin*, No. 13-CV-241 (SLT), 2014 WL 4161964, at *6 (E.D.N.Y. Aug. 19, 2014) (citing 42 U.S.C. § 405(g)). "This deferential standard of review does not apply, however, to the ALJ's legal conclusions." *Hilsdorf v. Comm'r of Soc. Sec.*, 724 F. Supp. 2d 330, 342 (E.D.N.Y. 2010). Rather, "[w]here an error of law has been made that might have affected the disposition of the case, . . . [an ALJ's] failure to apply the correct legal standards is grounds for reversal." *Pollard v. Halter*, 377 F.3d 183, 189 (2d Cir. 2004) (internal quotation marks omitted) (citation omitted).

## II.     Eligibility Standard for Supplemental Security Income

To qualify for SSI benefits, a claimant must show that she is "unable to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3). The claimant's impairment must be of such severity

that she is unable to do her previous work or, considering her age, education, and work experience, she cannot engage in any other kind of substantial gainful work that exists in the national economy. *Id.* In determining whether a claimant is disabled, the Commissioner engages in the following five-step analysis:

> [1] First, the Commissioner considers whether the claimant is currently engaged in substantial gainful activity.

> [2] If he is not, the Commissioner next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities.

> [3] If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the Commissioner will consider him *per se* disabled.

> [4] Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform his past work.

> [5] Finally, if the claimant is unable to perform his past work, the Commissioner then determines whether there is other work which the claimant could perform.

*Talavera v. Astrue*, 697 F.3d 145, 151 (2d Cir. 2012) (quoting *DeChirico v. Callahan*, 134 F.3d 1177, 1179–80 (2d Cir. 1998)); *see also* 20 C.F.R. § 416.920. The claimant has the burden of proof for the first four steps, but the burden shifts to the Commissioner for the fifth step. *Talavera*, 697 F.3d at 151.

## III.    Eligibility Standard for Disability Insurance Benefits

To establish eligibility for DIB, a claimant must provide medical and other evidence of her disability. 42 U.S.C. § 423(d). To be found disabled, the claimant must likewise have been unable to work due to "any medically determinable physical or mental impairment . . . which has lasted or can be expected to last for a continuous period of not less than 12 months," and the impairment must be of such severity that she is unable to do her previous work or, considering

her age, education, and work experience, she cannot engage in any other kind of substantial

gainful work that exists in the national economy.  *Id.*  The five-step analysis conducted by the

ALJ is the same as for SSI.  *See* 20 C.F.R. § 404.1520.

**DISCUSSION**

**I.     The ALJ's RFC Determination**

The responsibility for determining a claimant's RFC rests solely with the ALJ.  *See* 20

C.F.R. §§ 404.1527(d)(2), 404.1546(c).  The ALJ must consider all medical opinions together

with other relevant evidence.  20 C.F.R. § 404.1545.  It is for the ALJ to resolve genuine

conflicts in the evidence.  *Veino v. Barnhart*, 312 F.3d 578, 588 (2d Cir. 2002); *accord Schaal*,

134 F.3d at 504 ("It is for the SSA, and not this court, to weigh the conflicting evidence in the

record.").

The ALJ determined, in relevant part, that Williams "has the residual functional capacity

to perform a broad range of sedentary work," "can sit six hours in an eight hour workday, but

needs to take a five minute break every hour to change position," and "can stand and walk for a

combination of two hours in an eight hour workday, but must take a break every hour to sit for

five minutes."  (Admin. R. at 25.)

Williams challenges whether substantial evidence supports the ALJ's RFC determination

on the grounds that:  (1) the ALJ violated the treating physician rule by incorrectly rejecting

Dr. Singh's diagnoses of RSD and lumbar radiculopathy, which affected the RFC determination;

and (2) the ALJ did not consider the opinions of two examining physicians with respect to

Williams' sitting limitations.  (Pl.'s Mem. (Doc. No. 14) at 13–16.)

**a.     Treating Physician Rule**

Generally, an ALJ gives more weight to a claimant's treating sources because "these

sources are likely to be the medical professionals most able to provide a detailed, longitudinal picture" of the claimant's ailments and "may bring a unique perspective to the medical evidence." 20 C.F.R. § 404.1527(c)(2). An ALJ who declines to give controlling weight to a treating physician must give "good reasons" for his determination, and base his conclusion on several factors, including "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." *Schaal*, 134 F.3d at 503–04; *see also* 20 C.F.R. § 404.1527(c)(2). The ALJ's decision must make clear that he "applied the substance of the treating physician rule," even if the ALJ does not discuss each factor individually. *Halloran v. Barnhart*, 362 F.3d 28, 32 (2d Cir. 2004). When a treating physician's opinion is unsupported or inconsistent with other substantial evidence, the ALJ is not required to afford deference to that opinion and may use his discretion in weighing the medical evidence as a whole. *Id.* at 32.

### i.    RSD Diagnosis

Social Security Ruling 03-2p provides that RSD "constitutes a medically determinable impairment when it is documented by appropriate medical signs, symptoms, and laboratory findings," specifically "persistent complaints of pain that are typically out of proportion to the severity of any documented precipitant" and clinically documented signs of swelling, autonomic instability (including changes in skin color, texture, or temperature), abnormal hair or nail growth, osteoporosis, or involuntary movements of the affected region. The ME testified that Williams' symptoms did not fully meet what he expected to see for RSD, as described above. (Admin. R. at 68–69.) Williams counters that there is ample evidence in the record from multiple examining sources of symptoms supporting Dr. Singh's diagnosis of RSD, including

swelling, tenderness (including inability to keep her shoe on), mottled skin, and muscle atrophy.

(Pl.'s Mem. at 14 (citing Admin. R. at 53, 321, 323, 326, 328, 333, 337, 341, 345, 365, 383, 395,

399, 403, 407, 445, 449, 453, 457, 465, 476, 492, 508)).)

The ALJ's discussion of Williams' RSD diagnosis is as follows, in full:

> The file also indicates that the claimant has been diagnosed with reflex sympathetic dystrophy and complex regional pain syndrome. However, at the hearing, the medical expert testified that the record does not support these diagnoses. The undersigned concurs, finding no evidence to support these diagnoses or any functional limitations attributable to these impairments.

(Admin. R. at 24.) The ALJ did not substantively address the factors in the treating physician

rule nor did he provide "good reasons" for rejecting Dr. Singh's opinion. *Goff v. Astrue*, 993 F.

Supp. 2d 114, 122 (N.D.N.Y. 2012) (remanding where treating physician's opinion was

dismissed "with a single sentence, in which the ALJ indicated that the treating physician's

opinion was 'contradicted by the remainder of the medical record'"). In particular, the ALJ did

not "address substantial evidence supporting [claimant's] diagnosis – including the opinions of

two physicians who examined [claimant][.]" *Gorel v. Astrue*, No. 10-CV-5660 (NGG), 2012

WL 3250048, at *8 (E.D.N.Y. Aug. 7, 2012). Here, the record shows evidence of symptoms of

RSD that the ME claimed were lacking, and indeed, RSD was diagnosed not only by Dr. Singh,

but also by Dr. Jurkowich and consultative physician Dr. Shtock. (Admin. R. at 384, 583.)

Failure to address meaningfully any symptoms consistent with RSD, the opinions of physicians

who agreed with the diagnosis, and the factors of the treating physician rule is legal error.

The Commissioner argues, however, that any error in rejecting the RSD diagnosis was

harmless, because the ALJ nonetheless considered all of Williams' symptoms and limitations,

accepting them as consistent with tarsal tunnel syndrome. (Def.'s Mem. (Doc. No. 16) at 18.)

"Courts have held that error at step two in determining the severity of impairments is harmless if

the ALJ finds at least one other severe impairment and continues through the sequence of the

disability analysis because the non-severe impairments can later be considered at the RFC stage."

*Howard v. Comm'r of Soc. Sec.*, 203 F. Supp. 3d 282, 297 (W.D.N.Y. 2016) (collecting cases);

*see also Reices-Colon v. Astrue*, 523 F. App'x 796, 798 (2d Cir. 2013) ("Because these

conditions were considered during the subsequent steps, any error was harmless.").

 Here, after recognizing tarsal tunnel syndrome as a severe impairment at step two, the

ALJ expressly considered the symptoms and limitations that may have resulted from RSD at step

four. (Admin. R. at 26–29.) Specifically, the ALJ considered Dr. Singh's treatment notes

regarding, *inter alia*, Williams' pain, tenderness, paresthesia, and limitations in walking and

bearing weight. (*Id.* at 26–27.) The ALJ also considered treating physician Dr. Katsigiorgis's

findings of tenderness, decreased range of motion, positive SLR, and antalgic gait, as well as

Dr. Shtock's finding of muscle atrophy. (*Id.* at 27–28.) Williams does not identify any

functional limitations or symptoms that the ALJ failed to consider or that would have altered his

RFC analysis because he did not find that Williams suffered from medically determinable RSD.

 Furthermore, at the RFC step, the ALJ specifically explained that Dr. Singh's opinion

that Williams could not work or was totally disabled was accorded little weight because

Dr. Singh did not identify specific functional limitations and, at one point, indicated Williams

could in fact return to work. (*Id.* at 28.) The ALJ accepted Dr. Singh's opinion "only to the

extent that it indicates . . . the claimant has some functional restrictions, and given the findings

concerning her left foot and ankle, that these restrictions would preclude prolonged standing and

walking." (*Id.*) On this record, the ALJ adequately considered all symptoms and limitations,

including those potentially attributable to RSD, and therefore, any error in rejecting that

diagnosis was harmless.

### ii.    Lumbar Radiculopathy Diagnosis

The ALJ found that Williams' lumbar radiculopathy was "a medically determinable impairment," but that it did not "rise to the level of a severe impairment . . . for the requisite twelve month durational period." (*Id.* at 24.) No physician who diagnosed radiculopathy opined on its severity or resulting functional limitations, and conversely, no physician who assessed functional limitations diagnosed lumbar radiculopathy. (*Id.* at 299, 370, 384, 446, 466, 579.) The ALJ expressly considered EMG and nerve conduction studies from 2012 and 2014 that indicated lumbar radiculopathy but without active denervation, and found that findings of radiculopathy were countered by a 2013 MRI of the lumbar spine, which showed multilevel bulging and facet arthropathy but no disc herniation and no fracture. (*Id.*) In addition, Dr. Singh's physical examination of Williams' spine indicated normal findings. (*Id.* at 25.) The ALJ also relied on the ME's testimony that there was no support for a "current" finding of lumbar radiculopathy. (*Id.* at 24.) Thus, the ALJ's conclusion that Williams suffered from lumbar radiculopathy was actually consistent with the opinions of her treating physicians, and his determination that it was not severe was supported by substantial evidence.[13]

### b.    Williams' Sitting Limitations

Williams argues that the ALJ erred by failing to consider fully the opinions of consultative physicians Dr. Shtock and Dr. Elfenbein regarding Williams' sitting limitations and by relying on the ME's opinion to conclude she could sit for six hours a day. (Pl. Mem. at 16.)

The record contains assessments of specific functional limitations by three doctors in addition to the ME's testimony. In June 2012, Dr. Mills opined that Williams was "capable of

---

[13] In any event, even if the ALJ determined incorrectly that Williams' lumbar radiculopathy was not severe, any error would be harmless for the same reasons that rejection of the RSD diagnosis was harmless, in that all possible resulting limitations were considered in the RFC determination. (Admin. R. at 26–29.)

working with restrictions to be placed on no prolonged walking or standing," with no mention of sitting. (Admin. R. at 370 (discussed by the ALJ at 27).) In March 2013, Dr. Shtock stated that Williams had "[m]arked limitations with sitting long periods." (*Id.* at 384 (not discussed).)[14] In April 2014, Dr. Elfenbein concluded that Williams was "capable of working with restrictions to be placed on no prolonged walking, standing, or sitting." (*Id.* at 466 (discussed at 28).) The ME testified, without reference to any supporting evidence, "she would be able to sit cumulatively for six hours, but . . . she would be required to take a break every hour for five minutes to alter her position." (*Id.* at 65–66.)

The ALJ accorded the ME's opinion "great weight as it is consistent with the evidence in the record" and accepted the examining physicians' opinions "[t]o the extent that these opinions are consistent with a finding that the claimant is limited to standing and/or walking two hours in an eight hour workday," without addressing sitting limitations. (*Id.* at 28–29.) He found, "The record as explained by the medical expert at the hearing does not support a finding that the claimant cannot perform a broad range of sedentary work," and he concurred with the ME that Williams "can sit six hours in an eight hour workday, but needs to take a five minute break every hour to change position." (*Id.*)

"The use of the terms 'mild,' 'moderate,' and 'marked,' to describe the Plaintiff's restrictions in 'sitting, standing, and walking' are the kinds of vague terms, which courts have found insufficient to support a determination that a Plaintiff is not disabled under the Act." *Brady v. Colvin*, No. 14-CV-5773 (ADS), 2016 WL 1448644, at *8 (E.D.N.Y. Apr. 12, 2016) (collecting cases). In *Brady*, there was "little or no evidence" regarding the plaintiff's ability to sit for prolonged periods except for the opinions of two doctors who assessed "'moderate' and

---

[14] Dr. Shtock's assessment of other limitations is included in the ALJ's opinion, but the sitting limitations were not addressed. (Admin. R. at 27.)

'mild' limitations in sitting for prolonged periods." *Id.* at *9. "In the absence of any other direct medical evidence on this point, the Court [found] that the use of the terms, 'mild' and 'moderate' . . . do[es] not provide enough [] information to allow the ALJ to make the necessary inference that Plaintiff could perform the full range of sedentary work." *Id.* (collecting cases); *see also Girolamo v. Colvin*, No. 13-CV-6309 (MAT), 2014 WL 2207993, at *7 (W.D.N.Y. May 28, 2014) ("The terms 'moderately limited' and 'prolonged periods' under the circumstances in this case are vague, as it is not clear to the Court how the ALJ used Dr. Picinich's opinion to assess that Plaintiff was able to perform sedentary work with [particular restrictions]."). In *Girolamo*, the court also noted that although the ALJ relied on two medical opinions "because they were 'consistent' with Plaintiff's treatment history," the ALJ did "not explain – nor is it evident to this Court – what evidence in particular she is referring to and/or how Plaintiff's treatment records support her assessment that Plaintiff retains the ability to perform sedentary work with the particular additional limitations she assessed." *Id.* at *9.

Much like *Brady* and *Girolamo*, the record here reflects two doctors' opinions that Williams had limitations with sitting for prolonged periods. (Admin. R. at 384, 466.) The ALJ omitted one of these opinions from his rationale entirely and did not explain his rejection of the other, accepting the opinions only to the extent they addressed limitations on walking and standing. (*Id.* at 28.) By contrast, the opinion of the ME, who had not examined Williams, was accorded "great weight" because it was "consistent with" unspecified evidence that is not apparent to the Court. (*Id.* at 29.) "In short, [the ALJ's] conclusion that [Williams] could perform the full range of sedentary work is speculative and is not supported by substantial evidence." *Richardson v. Astrue*, No. 10-CV-9356 (DAB) (AJP), 2011 WL 2671557, at *12 (S.D.N.Y. July 8, 2011) (where consulting physician's opinion that plaintiff's ability to sit was

"mildly to moderately" impaired was "so vague as to render it useless in evaluating whether [plaintiff] could perform sedentary work"), *report and recommendation adopted*, 2011 WL 3477523 (S.D.N.Y. Aug. 8, 2011). This error warrants remand.

## II.    The ALJ's Step Five Determination

Williams' argument regarding the ALJ's determination at step five hinges entirely on the validity of the ALJ's RFC determination and the resulting hypothetical questions posed to the VE. (Pl.'s Mem. at 16–17.) Because the VE was questioned based on Williams' ability to sit six hours a day with five-minute breaks each hour, and that RFC is not supported by substantial evidence, the VE's opinion cannot constitute substantial evidence supporting a denial of disability. *See Melendez v. Astrue*, 630 F. Supp. 308, 318–19 (S.D.N.Y. 2009). Therefore, remand is also warranted on this ground.

## CONCLUSION

For the reasons set forth herein, the Court grants in part plaintiff's motion to remand (Doc. No. 13) and denies her motion in all other respects. The Commissioner's motion for judgment on the pleadings (Doc. No. 15) is granted in part and denied in part.

The matter is remanded to the Commissioner for further proceedings consistent with this opinion. The ALJ is directed on remand (1) to re-evaluate Williams' RFC with respect to her ability to sit and explicitly reconcile the opinions of Dr. Shtock and Dr. Elfenbein in order to explain adequately the RFC determination, and (2) to determine whether Williams, after considering her RFC, age, education, and work experience, can engage in any substantial gainful work that exists in the national economy.

The Clerk of Court is directed to enter judgment remanding this case to the

Commissioner of Social Security in accordance with this Memorandum and Order, and close this

case.

SO ORDERED.

Dated:  Brooklyn, New York
       September 26, 2018

*Roslynn R. Mauskopf*

_____
ROSLYNN R. MAUSKOPF
United States District Judge